JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

BRYAN TURNER

## DEFENDANTS

CITY OF PHILADELPHIA

**(b)** County of Residence of First Listed Plaintiff   PHILADELPHIA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   PHILADELPHIA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Melissa Freeman, Esq.                     215-868-7859
1617 JFK Blvd., 20th Fl.
Philadelphia, PA 19103

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT

- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### TORTS

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY

- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR

- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### BANKRUPTCY

- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS

- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY

- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS

- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES

- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

### REAL PROPERTY

- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS

- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS

**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION

- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §2000e, et seq.; 42 U.S.C. §1983; 43 P.S. §951, et seq.; Phila. Code §9-1101, et seq.

Brief description of cause:
Plaintiff brings this action against his employer for race discrimination and retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
In excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
09/14/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

Melissa Freeman, Esq.
Atty. ID: 88417
1617 JFK Blvd., 20th Fl.
Philadelphia, PA 19103                    *Attorney for Plaintiff*
Tel.: 215-868-7859
Email: mfreeman@freeman-law-firm.com

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA
_____

BRYAN TURNER                              :
Philadelphia, PA 19144                    :
           Plaintiff          : CIVIL ACTION NO.   2:20-cv-04502
                                          :
v.                                        :
                                          :
CITY OF PHILADELPHIA                      : JURY TRIAL DEMANDED
1401 John F. Kennedy Blvd.                :
Philadelphia, PA 19102                    :
           Defendant          :
_____

## **COMPLAINT**

### INTRODUCTION

1.      Plaintiff Bryan Turner (hereinafter, "Plaintiff") sets forth this complaint against employer, Defendant City of Philadelphia (Philadelphia Police Department) (hereinafter, "the City" or "Defendant"), for discriminatory and retaliatory acts in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*. ("Title VII"); 42 U.S.C. §1983 ("Section 1983"); the Pennsylvania Human Relations Act, 43 P.S. §951, *et seq*. ("PHRA"); and the Philadelphia Fair Practices Ordinance, as amended, Phila. Code §9-1101, *et seq*. ("PFPO"). Plaintiff contends Defendant transferred, investigated, suspended, filed a false criminal complaint against, and terminated him for engaging in protected activities, including participation in a prior Title VII lawsuit and complaining about discriminatory and retaliatory acts.

### PARTIES

2.      Plaintiff is an adult, African-American, male resident of Philadelphia, Pennsylvania 19144.

3.      Defendant is a political subdivision of the Commonwealth of Pennsylvania, with its principal office located at 1401 John F. Kennedy Blvd., Philadelphia, Pennsylvania 19102.

4.      Defendant maintains a police agency, Philadelphia Police Department (hereinafter, the "PPD"), responsible for law enforcement and investigations within the City of Philadelphia.

5.      At all times material hereto, Defendant acted by and through its authorized agents, servants, workers, and/or employees acting in the course and scope of their employment with Defendant and operating pursuant to the official policies, procedures and practices of the City and PPD.[1]

## JURISDICTION AND VENUE

6.      Jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343 and 1367(a). The causes of action which form the basis of this matter arise under Title VII, Section 1983, the PHRA, and the PFPO.

7.      Venue is proper in this Court under 28 U.S.C. §1391(b). A substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

8.      Plaintiff complied with administrative pre-requisites. A charge of discrimination was dual filed with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") on April 16, 2019, and the agencies issued "Right to Sue" notices on August 5, 2020 and June 23, 2020, respectively. Notices attached hereto as Exhibit "A".

---

[1] PPD directives contain policies and procedures by which police personnel operate.

FACTUAL ALLEGATIONS

9.     Plaintiff was employed as a police officer with the PPD from July 25, 2011 until his termination on or about December 7, 2018.[2] Plaintiff was also a sergeant in the U.S. National Guard, and part-time college student through a tuition grant from the military.

*Plaintiff's Engagement in Protected Activities*

10.     Plaintiff filed a lawsuit in 2016 captioned *Bryan J. Turner v. City of Philadelphia*, U.S. District Court for the Eastern District of Pennsylvania, Civil Action No. 16-4476 (hereinafter, the "prior lawsuit"), which, in part, alleged retaliatory acts committed by Plaintiff's commanding officer, Capt. Daniel O'Connor of the 24th police district.[3]

11.     On July 24, 2017, a judge partly denied the City's summary judgment motion, finding Plaintiff raised a genuine dispute of material fact regarding a retaliation claim, for which the City offered no legitimate, non-retaliatory reasons for its actions.

12.     Plaintiff favorably resolved the prior lawsuit upon return of a signed settlement agreement between Plaintiff and Defendant on or about August 28, 2017.

13.     On July 31, 2017, the Internal Affairs Bureau ("IAB") reprimanded Plaintiff for his social media posts about the PPD's failure to terminate and arrest Ofc. Ryan Pownall, who fatally shot African-American suspect, David Jones, in the back in June 2017 as he fled police unarmed. Plaintiff held that the shooting was motivated by racial discrimination.

14.     On August 18, 2017, Plaintiff posted a photo on social media of a police officer standing in front of anti-police graffiti to depict the growing public disdain for the PPD over the handling of recent events. Plaintiff supported Black Lives Matter (BLM) protesters in their lawful

_____

[2] Plaintiff's request for the release of funds from the City of Philadelphia Deferred Compensation Plan and Pension Board was denied because he remained under suspension status until on or about December 7, 2018.

[3] Plaintiff met with Capt. O'Connor to complain about discrimination, the captain would not agree to transfer supervision from a hostile supervisor during the meeting, and Plaintiff was immediately subjected to retaliatory action, including attempted disciplinary action for missing a court appearance when he had a valid, documented reason for the absence.

actions to pressure public officials to terminate and charge the officer.[4]

15.     Plaintiff spoke against Fraternal Order of Police (FOP) President John McNesby when he publicly called a BLM organizer a "two-bit punk" on August 25, 2017, and again when he called the mostly African-American protesters "a pack of rabid animals" during a "Back the Blue" counter-protest in front of the news media on August 31, 2017.

16.     The IAB took formal disciplinary action months later for Plaintiff's continued speech against Ofc. Pownall and FOP Pres. McNesby, stating Plaintiff "insinuate(d) that the Philadelphia Police Department is a racist organization" and Plaintiff has "little or no regard for the Department and [his] position in it."

17.     Plaintiff received several hostile comments that he reported to Capt. O'Connor and the IAB between August 2017 and September 2017, including as follows:

        (a)     A photo was lifted from Plaintiff's social media account and police officers republished it with comments that took it out of context and falsely portrayed Plaintiff as having anti-police sentiment.[5]

        (b)     A sergeant asked for Plaintiff's badge and district assignment so that he does not accidentally contribute to his fund when he gets killed.

        (c)     A police officer wrote that he hopes Plaintiff gets "caught in crossfire..."

        (d)     On September 4, 2017, Plaintiff was physically threatened through social media messages by an individual claiming to be John Herbert, a retired police officer (hereinafter, "Mr. Herbert"). Mr. Herbert gave Plaintiff first notice of impending, adverse employment action, which the PPD leaked to Mr. Herbert from Plaintiff's confidential personnel file.

---

[4] Ofc. Pownall was eventually terminated and charged with the murder of Mr. Jones about a year later in a pending criminal action.

[5] The photo featured Plaintiff wearing an anti-police tee shirt, bandana and gold chain, while making a hand gesture known to be a "West Coast" gang sign. The context of the original Facebook post showed Plaintiff in costume to attend the 2015 opening of a popular gang-related movie, "Straight Outta Compton."

*Refusal to Investigate Hostile Treatment*

18.    Neither Capt. O'Connor, the IAB nor Police Comm. Richard Ross took action on Plaintiff's reports of hostile treatment, showing others that they could freely attack Plaintiff without fear of repercussion.

19.    Plaintiff filed an incident report (75-48) in the 24th district complaining about Mr. Herbert's September 4, 2017 messages, and gave the messages to Capt. O'Connor to facilitate an investigation. The captain refused to investigate the source of the leak or seriousness of the threats, or otherwise take action on the 75-48.

20.    Plaintiff complained to the IAB about hostile treatment from Caucasian police personnel who supported Ofc. Pownall. Instead of investigating them, the IAB took disciplinary action against Plaintiff on or about January 8, 2018 for opposing the officer.[6]

21.    Plaintiff notified Police Comm. Ross about hostile treatment and formally requested a meeting with him. The request was stamped denied. He took no action.

*IAB Referral*

22.    On September 4, 2017, Capt. O'Connor referred Plaintiff to the IAB for investigation into Plaintiff's alleged falsification of the shared electronic Preliminary Arraignment Reporting System report (hereinafter, the "PARS report" or "report"), based on information the captain received from patrol supervisor, Sgt. David Armstrong, on September 1, 2017.

23.    First, Sgt. Armstrong accused Plaintiff, who was assigned to a solo detail on September 1, 2017, of lying on the PARS report about, Ofc. Melissa Butcher, being a second officer on the DUI arrest of suspect, K.B. The sergeant alleged Plaintiff further lied on the report about Ofc. Butcher being needed for a hearing.

24.    The alleged motive for including Ofc. Butcher was so that Plaintiff could steal

---

[6] Ofc. Pownall was terminated and arrested several months later following public pressure.

court overtime pay for her if she were later called to testify in court at a time when she was not already on duty.[7]

25.     Second, Sgt. Armstrong accused Plaintiff of lying on the same report about when nine narcotics packets were recovered. The report indicated they were recovered at a time that was after Sgt. Armstrong arrived on the DUI scene, but the sergeant maintained that Plaintiff told him they were recovered before he arrived.

26.     Third, Sgt. Armstrong accused Plaintiff of going on break without first obtaining coverage from another patrol unit. Plaintiff asked for coverage, but the sergeant determined that no unit, which would have been assigned to patrol a different area, arrived to take over for Plaintiff. Plaintiff arrested K.B. while he was on break.

27.     Pending the results of the IAB investigation against Plaintiff, the PPD planned to reclaim his service weapon and transfer him to restricted duty at the "DPR" on September 5, 2017.

28.     DPR was a non-preferential and otherwise non-desirable assignment, often used for police personnel who were under investigation for suspected wrongdoing. Overtime pay and the opportunity to earn commendations toward promotion were not available at the DPR.

29.     Plaintiff first received notice of the impending DPR re-assignment, not from Capt. O'Connor, but on September 4, 2017 via Mr. Herbert's social media messages, which stated, in part:

        (a)     "Has the Black Lives Matter food and medicine envoy reached Houston yet. Just curious."[8]

        (b)     "How about I meet you at your district one day end the end of your tour. You see son, I have quite the reputation in the PPD. Ask your CO [Commanding Officer] and some of the old heads…Even this OLD F**** retired p**** will permanently cripple you…I a very bad man there son and I could really use a good a** kicking from a skinny little p**** like you. You probably weigh as much as Michael Jackson right?"

---

[7] If an arresting officer was called to testify, then the officer did not get court overtime pay if she was already on duty.
[8] Hurricane Harvey had recently hit Texas.

(c)      "Yo Urkle, you're in DPR you f******* p****. Now I have your address too. Why don't you cry to EEOC you f****** butch a** suck your mommy's t*t f**g**. The whole PPD is on to you now. You looking over your shoulder???? It's just a matter of time."[9]

(d)      "You are so f*****. You have no idea what's coming. Watch you back little f**g**."

30.     On September 5, 2017, Capt. O'Connor reclaimed Plaintiff's service firearm and he was transferred to restricted duty at the DPR, where he remained for about a year.

*IAB Investigation*

31.     The assigned IAB investigator, Sgt. Quiana Richardson, reviewed one or two years of Plaintiff's prior arrests for evidence of other false reports, and only found one other error.[10] On the DUI arrest of suspect, S.W., on August 5, 2017, Ofc. Butcher was again listed in error as a second officer needed at a hearing, although Plaintiff patrolled alone.

32.     Ofc. Butcher never received a court notice for S.W.'s case, which resolved by pre-trial disposition.

33.     Sgt. Richardson failed to interview material witnesses, including Capt. O'Connor, Cpl. Louis Halegoua, Lt. Marc Hayes, Civilian Christina Reed, Plaintiff, and all PARS users authorized to review and alter the PARS reports in question.

34.     From Lt. Haye's testimony at Plantiff's criminal trial, the supervisors and Sgt. Richardson would have known with a proper investigation that Plaintiff was allowed a break without having to wait for another patrol unit to cover his assigned area.

35.     A hostile work environment existed by disciplining a patrol officer on a solo detail for taking restroom and/or meal breaks if another unit is unavailable or otherwise unable to relieve

---

[9] "Urkel" is a derogatory term for a skinny, annoying African-American kid, named from character, Steve Urkel, from the 1990s television sitcom, Family Matters.

[10] See February 15, 2018 Investigating Grand Jury Testimony of Sgt. Richardson, Tr. at 42, Lines 17-24.

the officer within a reasonable time.

36.    Civ. Reed, who was the assigned investigator for both suspects' arrests, was able to determine from her investigation that Plaintiff was the only arresting officer. The assigned investigator has access to review and prepare the PARS report.[11]

37.    Cpl. Halegoua was the operations room supervisor (ORS) responsible for reviewing the PARS report and correcting any deficiencies prior to approving it.

38.    Neither Capt. O'Connor nor Sgt. Armstrong informed the corporal of the alleged falsification, although the sergeant believed "(t)he integrity of this entire arrest was questionable." The report was approved and escalated to the District Attorney's (DA's) Charging Unit (DACU).

39.    From Cpl. Halegoua's testimony at Plaintiff's criminal trial, the supervisors and Sgt. Richardson would have known with a proper investigation that the corporal would have allowed Plaintiff to correct the PARS report error if the corporal had known about it on September 1, 2017, and that he let other police officers correct their mistakes.[12]

40.    The PPD does not discipline police officers merely for making clerical or inadvertent errors on an arrest report. PPD directives set forth procedures for multiple-level review of reports and court notices, a function to edit the PARS reports, and procedure to cancel any court notice received in error before the subpoenaed officer attends court.

41.    In an unrelated arrest, Ofc. D.S. incorrectly identified Ofc. D.S., both Caucasian, as a second arresting officer on a PARS report. Both were reprimanded after a court notice was received in error, but only because the officer failed to notify a supervisor that he was not needed for court.

---

[11] PPD Directive 5.14-2, Investigation and Charging Procedure.

[12] Police officers made clerical errors occasionally, without the same being regarded as evidence of falsification. The practice was to call them to the operations room to discuss and correct the mistake, or place the record in an envelope with the officer's name on it and tape to a window.

42.     Moreover, the PPD would not be able to discipline a police officer in good faith for even an alleged intentional error on the PARS report, without first investigating all users authorized to review and alter the report, and ruling out all other possible sources of the error.

43.     Sgt. Richardson failed to seize, analyze and report electronic evidence related to the PARS. She failed to preserve evidence from spoliation. She did not interview, or document the names of, all other users authorized to review, add to or edit the reports.

44.     No supervisor or other authority interviewed Plaintiff while his recollection was fresh as to circumstances surrounding the PARS report preparation.

45.     No supervisor or other authority interviewed Plaintiff to determine if there was motive to falsify the PARS reports. He did not stand to gain from either attempting to steal court overtime pay for another officer, or from reporting that narcotics were recovered after instead of before Sgt. Armstrong's arrival.[13]

46.     On September 21, 2017 and October 10, 2017, Sgt. Richardson interviewed Ofc. Butcher. Both times, the sergeant asked if the officer received a court notice yet, but took no action to have the PARS report edited or otherwise note the officer's non-involvement in the arrest file, when no court notice had been issued.

47.     Ofc. Butcher informed a supervisor upon receiving a first court notice for November 1, 2017. Against PPD directives, she was instructed to appear for court. The supervisor took no action to have the notice cancelled.[14]

48.     Ofc. Butcher appeared and let the Assistant District Attorney (ADA) know about her non-involvement, but was issued another notice.

49.     Ofc. Butcher was already on duty at the time of her appearance, and received no

---

[13] K.B. handed Plaintiff the narcotics packets. No allegation was made that he performed a female body search. No search warrant for narcotics was needed either way.
[14] PPD directive 6.2-18, Court Notices and Subpoenas.

extra pay for attending court.

50.     Upon receiving the second court notice for December 13, 2017, Ofc. Butcher undertook the supervisor's duty to have the notice cancelled.

51.     Ofc. Butcher stated in an interview with Sgt. Richardson that Plaintiff never approached her with any plan to lie about her being an arresting officer.

52.     Several police personnel, including Sgt. Armstrong, interviewed that they had not previously known Plaintiff to falsify arrest records.

53.     The PPD turned over the investigation file to the DA's office, and pursued criminal charges.

*Overview of the PARS Report*

54.     At all times material hereto, the PARS report was an electronic form shared between several users authorized to review, add, and/or edit information contained therein to produce a collaborative PPD report for DACU.[15]

55.     The PARS report, on its face, did not track edits or automatically identify users who reviewed or altered the report.

56.     As examples, Sgt. Armstrong accessed the September 1, 2017 report, but is not identified. A detective added the narcotics charge on the same report, but is not identified. If a user were to add Ofc. Butcher as a second arresting officer or edit a drop down menu selection regarding whether she is needed for a hearing, the report would not identify the user or show that the report had been edited.

57.     Plaintiff   was   responsible   for   initially   completing   certain   information:

---

[15] See PPD Directive 5.14-1.

witnesses/arresting officers; non-narcotics charges; and the facts of the case.[16]

58.     Plaintiff quite often patrolled with Ofc. Butcher, and was responsible for completing the PARS reports for arrests they made together.

59.     The arresting officers were listed on the PARS report using an auto-populate feature. Upon Plaintiff entering the officers' six-digit payroll numbers,[17] the names and vacation schedules automatically populated.[18]

60.     The report asked if each officer is needed for a hearing with a drop down menu below. Selecting yes or no did not automatically generate or preclude the ADA from calling necessary witnesses.[19]

61.     The facts of the case were to be written in a manner that clearly identified which observations and acts were attributable to each listed officer, if there was more than one.[20]

62.     Any PARS report listing more than one officer without presenting clear facts was cause for the ORS to return the report for clarification before approval.

63.     A supervisor ultimately represented the PPD's position to DACU on who is needed for a hearing, as well as requested a hearing date and courtroom on the PARS report.

64.     After Plaintiff completed his part of the report, he submitted it for review and further preparation.

*K.B. Arrest*

---

[16] Plaintiff received an overview on completing the PARS report at the Philadelphia Police Academy, but no formal training or written training materials were provided or available at any time thereafter.

[17] Plaintiff knew Ofc. Butcher's payroll number by memory, particularly because her first three numbers were the same as his.

[18] Sgt. Armstrong first testified before the investigating grand jury that Plaintiff would have entered Ofc. Butcher's name manually in the PARS report, but later testified that the information auto-populates by entering the payroll number.  February 9, 2018 Investigating Grand Jury Testimony of Sgt. Armstrong, Tr. at 23, Lines 13-22; Tr. at 35, Lines 6-15. However, the DA's office drafted the presentment to find that Ofc. Butcher's name had to be manually entered without mention of the later contradiction, among other problematic mischaracterizations of the testimony.

[19] The DA's office has access to the electronic PARS report, and the entire arrest file, which is uploaded and sent to the DA's charging unit electronically.

[20] See PPD directive 6.2-17.

65.     On September 1, 2017, Plaintiff arrested K.B. for driving under the influence (DUI), after witnessing her vehicle hit a pole in a single car accident and observing other indicia of DUI. She had empty narcotics packaging in the vehicle in plain view of the officer.

66.     At the beginning of the shift, Sgt. Armstrong assigned Plaintiff to a solo detail at roll call and copied the ORS, Cpl. Louis Halegoua, on the assignment sheet.

67.     Plaintiff called Sgt. Armstrong to assist with K.B.'s arrest, and informed him about seeing empty narcotics packaging. He had not recovered any narcotics at the time.

68.     To the contrary, Sgt. Armstrong maintained that Plaintiff said he recovered nine narcotics packets prior to his arrival. The sergeant did not see these packets at that time and assumed they were in Plaintiff's pocket.

69.     Ofc. Erica Perez was called to perform a female body search for contraband, and transport K.B. to a detention unit for DUI testing.[21]

70.     K.B. denied having narcotics on her at first, but was aware that a female officer had been called to search her.

71.     As Ofc. Perez's vehicle arrived on location, K.B. admitted to having narcotics on her person. While seated in Plaintiff's patrol vehicle, she retrieved nine narcotics packets containing suspected heroin, and handed them to Plaintiff.

72.     When Ofc. Perez approached, K.B. said she already handed narcotics to Plaintiff. Ofc. Perez then observed him counting the nine packets at the back of his vehicle, consistent with having recovered them immediately beforehand.[22]

73.     Plaintiff handwrote the 75-48 on location, and gave a carbon copy to Ofc. Perez for transport. Ofc. Butcher is not mentioned in the 75-48 as an arresting officer.

---

[21] The toxicology report was positive for heroin.
[22] February 9, 2018 Investigating Grand Jury Testimony of Ofc. Perez, Tr. at 10, Lines 10-15.

74.     The accident report was handwritten on location, and shows K.B. handed narcotics to Plaintiff when Ofc. Perez arrived on location. The accident report does not mention Ofc. Butcher.

75.     The investigation report (75-49) which Civ. Reed prepared identified Plaintiff as the only arresting officer.

76.     Plaintiff placed the narcotics on a property receipt (75-3) and signed as the arresting officer. Ofc. Butcher is not on the receipt.

77.     Plaintiff drafted the facts of the case on the PARS report without attributing any observations or acts to Ofc. Butcher.

78.     No part of the arrest file for K.B. includes Ofc. Butcher except for where she is listed on the electronic PARS report.

79.     Cpl. Halegoua approved the 75-49.

80.     Cpl. Halegoua approved the PARS report without calling for any correction. The case escalated to DACU on September 2, 2017.

81.     In addition to not conferring with Cpl. Halegoua about the alleged falsified report, neither Capt. O'Connor nor Sgt. Armstrong informed DACU.

82.     The DA's office continued prosecuting K.B. for over a year, even while Plaintiff was being prosecuted by the same office for falsifying her arrest report.

*S.W. Arrest*

83.     Similarly, no arrest record from S.W.'s August 5, 2017 arrest mentioned Ofc. Butcher except for where the PARS report listed her as a second officer needed for a hearing. Civ. Reed's 75-49 again listed Plaintiff as the only arresting officer.

84.     Sgt. Armstrong was the supervisor assigned to review the August 5, 2017 PARS report and 75-49. He approved the 75-49, but neglected to review the PARS report.

85.     No supervisor was accused of attempting to steal court overtime pay for another officer, or disciplined or criminally prosecuted for making a mistake.

*Investigating Grand Jury*

86.     In February 2018, an investigating grand jury convened. In June 2018, criminal charges were recommended based on the PPD's misleading testimony and omissions of material facts.

87.     Material witnesses who Sgt. Richardson failed to interview during her investigation were also not called to testify before the investigating grand jury.

88.     Testimony was omitted concerning all users authorized to access, add to and/or edit the PARS reports.

89.     Testimony was omitted concerning procedures on multi-level reviews of arrest records and court notices, and cancelling a court notice received in error.

90.     Sgt. Armstrong and Sgt. Richardson misrepresented that Plaintiff selecting an arresting officer as needed for a hearing automatically generated a court notice for that officer. Sgt. Armstrong testified later the same day that the officer selection generated a court notice unless the ADA reviewed the documents and determined whether or not the officer is needed to testify.[23]

91.     The testimony erroneously assumed that Plaintiff was qualified to answer the question on who is needed for court. Plaintiff was not legally trained to determine which officers are needed to testify.

92.     Per PPD directives, supervisors approve and disapprove officers needed for court.[24] Supervisors are required to review and initial all arrest and investigative reports, including PARS

---

[23] February 15, 2018 Investigating Grand Jury Testimony of Sgt. Richardson, Tr. at 16, Lines 11-24; February 9, 2018 Investigating Grand Jury Testimony of Sgt. Armstrong, Tr. at 25, Lines 22-25; Tr. at 26, Lines 1-5; Tr. at 29, Lines 23-25; Tr. at 30, Lines 1-3.
[24] PPD directive 5.14-2.

reports within 10 hours of their completion to ensure only those officers/investigators who are necessary for the successful outcome of the case are listed.[25]

93.    Despite the supervisors' input, the assigned ADA ultimately decides on witnesses for every court appearance.

*Plaintiff Suspended and Criminally Charged*

94.    On or about August 29, 2018, criminal charges were approved.

95.    On August 30, 2018, Plaintiff was suspended without pay and with intent to dismiss for the above allegations, which formed the basis for criminal charges. He was arrested.

96.    Plaintiff was charged with:

(a)    Attempted Theft by Deception (18 Pa.C.S. §§3922/901) (Two Counts), 1st Degree Misdemeanor;

(b)    Obstruction of Justice (18 Pa.C.S. §5101) (Two Counts), 2nd Degree Misdemeanor;

(c)    Unsworn Falsification to Authorities (18 Pa.C.S. §4904) (Two Counts), 2nd Degree Misdemeanor; and

(d)    Official Oppression (18 Pa.C.S. §5301) (Two Counts), 2nd Degree Misdemeanor.

97.    Plaintiff vehemently denies committing the unlawful acts.

98.    Plaintiff requested a grievance hearing through the FOP to dispute adverse action, but did not receive a pre-termination hearing.

99.    The above-described allegations were mere pretext to conceal the discriminatory and retaliatory reasons adverse employment action was taken against Plaintiff.

100.    Defendant refused to reinstate Plaintiff after he was found not guilty of all charges

---

[25] PPD directive 6.2-17, Court Notices and Subpoenas.

in June 2019 following a jury trial before the Honorable Anne Marie Coyle.[26]

*Plaintiff Terminated*

101.   Although Plaintiff received a notice of unpaid suspension on August 30, 2018 with the intent to dismiss in 30 days, Defendant held him in suspension status until employment terminated on or about December 7, 2018.

102.   By the extended unpaid suspension, Defendant prevented Plaintiff from accessing his funds from the City of Philadelphia Deferred Compensation Plan and Pension Board to cover expenses.

103.   As a result of the criminal charges pending beyond Plaintiff's time to renew his military contract, Plaintiff could not re-enlist with the U.S. National Guard. He lost a second income, his educational benefit and was unable to re-enroll in college to complete his Bachelors degree in Criminal Justice.

104.   Defendant grossly mischaracterized Plaintiff's alleged acts as proving he had such character or reputation that he is likely to act in a manner dangerous to public safety. This would later disqualify him from obtaining a license to carry a firearm, even after he was absolved of wrongdoing.[27]

105.   As a result of Defendant finding Plaintiff ineligible to carry a firearm, Plaintiff is unable to meet a pre-requisite for most jobs in the law enforcement and related fields.

106.   Plaintiff has been unable to find employment in the law enforcement or a related field, and has suffered substantial loss of income, benefits, and career advancement.

107.   Plaintiff has incurred legal expenses to defend against the criminal case, and will

---

[26] The Philadelphia District Attorney's (DA's) office bypassed the municipal court level and the preliminary hearing.

[27] Plaintiff applied to Defendant for a gun permit on September 11, 2019. Defendant referenced Plaintiff's police employment file to make a decision on the gun permit application and denied the same because the "(a)pplicant is an individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety." The relevant dates of the employment information are "8/30/18 & PRIOR CONDUCT WITH POLICE DEPT." Plaintiff appealed the gun permit denial on September 21, 2019 but a hearing has not been scheduled to date.

incur future expenses for related administrative matters.

108.    Plaintiff has suffered emotional distress, such as increased anxiety, heart palpitations, loss of appetite, sleeplessness, headaches, shakiness, loss of social connections and increased isolation.

## COUNT I - *TITLE VII, 42 U.S.C. §2000e-2, et seq.*

109.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

110.    Defendant engaged in unlawful employment practices on the basis of protected status in violation of 42 U.S.C. §2000e-2, et seq., by subjecting Plaintiff to a hostile and discriminatory work environment on the basis of race.

111.    Defendant's conduct, as complained of above, adversely affected Plaintiff's status as an employee and led to termination because of his race in violation of Title VII.

112.    Defendant's unlawful employment practices, as complained of above, were willful in that they were committed with reckless disregard toward Plaintiff's federally protected Title VII rights.

113.    As a direct and proximate result, Plaintiff suffered and continues to suffer economic and compensatory damages, including but not limited to, lost wages and benefits, lost opportunities for advancement within the PPD, lost second income and educational benefits, inconvenience, emotional distress, humiliation, and attorney's fees and costs.

## COUNT II - *TITLE VII, 42 U.S.C. §2000e-3, et seq.*

114.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

115.    Defendant engaged in unlawful employment practices in violation of 42 U.S.C.

§2000e-3, et seq., by subjecting Plaintiff to retaliatory acts for engaging in protected activities, as complained of above.

116.    Defendant's conduct, as complained of above, adversely affected Plaintiff's status as an employee and led to termination because of his race in violation of Title VII.

117.    Defendant's unlawful employment practices, as complained of above, were willful in that they were committed with reckless disregard toward Plaintiff's federally protected Title VII rights.

118.    As a direct and proximate result, Plaintiff suffered and continues to suffer economic and compensatory damages, including but not limited to, lost wages and benefits, lost opportunities for advancement within the PPD, lost second income and educational benefits, inconvenience, emotional distress, humiliation, and attorney's fees and costs.

COUNT III – *SECTION 1983*

119.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

120.    Defendant's discriminatory and retaliatory acts as set forth herein, deprived Plaintiff of constitutional rights and violated Section 1983.

121.    Defendant deprived Plaintiff of his First Amendment rights to freedom of speech and association under the U.S. Constitution, as set forth herein.

122.    Said rights were deprived in violation of the Equal Protection Clause of the U.S. Constitution by Defendant's policies, practices and/or customs to treat African-American employees less favorably than Caucasian employees, which was committed, directed, implemented and/or ratified by employees of Defendant in supervisory capacities and other authorities with policymaking and decision-making power.

123.   As a direct and proximate result, Plaintiff suffered and continues to suffer economic and compensatory damages, including but not limited to, lost wages and benefits, lost opportunities for advancement within the PPD, lost second income and educational benefits, inconvenience, emotional distress, humiliation, and attorney's fees and costs.

COUNT IV - *PHRA*

124.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

125.   Defendant engaged in unlawful employment practices in violation of the PHRA by subjecting Plaintiff to discriminatory and retaliatory acts, as complained of above.

126.   Defendant's conduct, as complained of above, adversely affected Plaintiff's status as an employee and deprived him of all employment opportunities because of his race in violation of the PHRA.

127.   Said violations were done with malice and/or reckless indifference toward Plaintiff's protected rights under the PHRA.

128.   As a direct and proximate result, Plaintiff suffered and continues to suffer economic and compensatory damages, including but not limited to, lost wages and benefits, lost opportunities for advancement within the PPD, lost second income and educational benefits, inconvenience, emotional distress, humiliation, and attorney's fees and costs.

COUNT V - *PFPO*

129.    Plaintiff re-alleges and incorporates by reference the allegations contained in the paragraphs above, and those that come after as if fully set forth here.

130.   Defendant engaged in unlawful employment practices in violation of the PFPO by subjecting Plaintiff to discriminatory and retaliatory acts, as complained of above.

131.   Defendant's conduct, as complained of above, has adversely affected Plaintiff's

status as an employee and deprived him of all employment opportunities because of his race in violation of the PFPO.

132.   Said violations were intentional and willful.

133.   As a direct and proximate result, Plaintiff suffered and continues to suffer economic and compensatory damages, including but not limited to, lost wages and benefits, lost opportunities for advancement within the PPD, lost second income and educational benefits, inconvenience, emotional distress, humiliation, and attorney's fees and costs.

## RELIEF

WHEREFORE Plaintiff prays for judgment in his favor and against Defendant as follows:

(a)   Declaring Defendant's actions in violation of Title VII, Section 1983, the PHRA, and the PFPO;

(b)   For injunctive relief to reinstate Plaintiff to employment with retroactive seniority;

(c)   For economic damages to make Plaintiff whole for loss of career opportunities and advancement, of all lost earnings, earning capacity and benefits, past and future, and for lost second income and educational benefits, and legal expenses;

(d)   For compensatory damages for inconvenience, emotional distress, and humiliation;

(e)   For incidental, treble and/or punitive damages;

(f)   For reasonable attorneys' fees and costs of this action; and

(g)   For such other and further relief as this Court deems just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

DATE: <u>September 14, 2020</u>                <u>/s/ Melissa Freeman</u>
                                                MELISSA FREEMAN, ESQ.
                                                1617 JFK Blvd., 20th Fl.
                                                Philadelphia, PA 19103
                                                Tel.: 215-868-7859
                                                *Attorney for Plaintiff*

<u>VERIFICATION</u>

I, Bryan Turner, Plaintiff in this action, hereby verify under penalty of perjury that I have read the Complaint and the statements of fact contained therein are true and correct to the best of my knowledge and recollection.

_____

BRYAN TURNER, PLAINTIFF

# EXHIBIT A

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

August 05, 2020

Mr. Bryan Turner
c/o Melissa Freeman, Esquire
Freeman Law Firm
1617 JFK Blvd., 20th Fl.
Philadelphia, PA  19103

Re:  EEOC Charge Against City of Philadelphia Police Dept.
    No. 17F202060085

Dear Mr. Turner:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Philadelphia District Office, Philadelphia, PA.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                                        Sincerely,

                                        Eric S. Dreiband
                                        Assistant Attorney General
                                        Civil Rights Division

                            by        /s/ Karen L. Ferguson
                                        Karen L. Ferguson
                                        Supervisory Civil Rights Analyst
                                        Employment Litigation Section

cc: Philadelphia District Office, EEOC
   City of Philadelphia Police Dept.


**pennsylvania**
HUMAN RELATIONS COMMISSION

June 23, 2020

Bryan Turner
c/o Melissa Freeman, Esq.
124 Chestnut Street, Suite 6
Philadelphia, PA 19106

    RE:  Bryan Turner Vs. City of Philadelphia (Police Department)
          Case No. 201803206
          EEOC No. 17F202060085

Dear Bryan Turner,

It has been one year since you filed your complaint with the Pennsylvania Human Relations Commission. This is to notify you that you now have the right to bring an action in the appropriate Pennsylvania Court of Common Pleas based on the alleged violations of the PHRAct contained in your Commission complaint. This right is provided under Section 12(c) of the Human Relations Act, 43, P.S. § 962(c).

Please be advised that you are not required to file such an action in the State Court of Common Pleas. The Commission is continuing to process your case, and we will make every effort to resolve it as soon as possible. If we are not notified otherwise, we will assume that you want the Commission to continue handling your case.

If you do file a complaint in a Court of Common Pleas, the Commission will dismiss your complaint. This means that you will be unable to have the Commission decide your case even if your complaint is dismissed in State Court because of a procedural error. Procedural errors may include filing the complaint in State Court in the wrong county or filing in State Court after your time to file has expired. For this reason, you should make every effort to assure that any complaint you file in State Court will be properly filed before you file it.

If you believe you might want to take your case to State Court, we suggest that you consult a private attorney about representing you in that action. This should be done before you file the complaint so that your attorney may advise you on the best course of action for you to take.

Should you file a complaint in State Court, you are required by Section 12(c)(2) of the PHRAct to serve the Human Relations Commission with a copy of the Court complaint. This copy must be served on the Commission at the same time you file it in Court. The copy is to be sent to:
          Chief Counsel
          Pennsylvania Human Relations Commission Executive Offices
          333 Market Street, 8th Floor
          Harrisburg, PA 17104-2210
If you have any questions concerning this matter, please feel free to contact the investigator who is handling your case.

Very Truly yours,

*Jinada Rochelle*

Jinada Rochelle

Enforcement Office

cc: Melissa Freeman, Esq.